# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 21-0501V

|  |  |
|---|---|
| KAREN BAIRD,  <br><br>                    Petitioner,  <br>v.  <br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,  <br><br>                    Respondent. | Chief Special Master Corcoran  <br><br>Filed: November 19, 2025 |

*Leigh Finfer*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Madelyn Weeks*, U.S. Department of Justice, Washington, DC, for Respondent.

## **DECISION AWARDING DAMAGES**[1]

On January 11, 2021, Karen Baird filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on October 11, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

Respondent conceded that Petitioner was entitled to compensation (ECF No. 28), but the parties were unable to resolve damages. The question of damages has now been fully briefed and is ripe for resolution (ECF Nos. 44, 47, 48). For the reasons set forth

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website , and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

below, I find that Petitioner is entitled to a damages award of **$175,000.00 for actual pain and suffering, plus $5,763.56 for out of pocket expenses.**

## I.   Relevant Facts
### A.  Medical Records

Petitioner had a pre-vaccination medical history significant for complex regional pain syndrome ("CRPS"), also known as reflex sympathetic dystrophy ("RSD"). Ex. 3 at 131. The record reflects that for at least four years prior to vaccination, she saw Dr. Roy Lerman regularly for management of neck, left shoulder, and back pain, with frequent physical therapy ("PT"). *Id.* at 43-76. Less than two months before vaccination, Petitioner began a round of PT for cervicalgia, radiculopathy of the lumbar region, and myalgia. *Id.* at 179.

Petitioner received a flu vaccine in her right arm at her workplace on October 11, 2018. Ex. 15 at 1-3; Ex. 16 at 1-2; Ex. 8 at ¶ 2. The following day (October 12, 2018), at a PT session for her neck and back pain, she reported that a "[f]lu shot this week aggravated R pectoralis region," resulting in pain and sensitivity. Ex. 2 at 193. At a PT session the following week (October 19, 2018), she reported that her right shoulder pain persisted, and she was scheduled to see her doctor the following week. *Id.* at 199.

On October 26, 2018 (now two weeks after vaccination), Petitioner saw Dr. Lerman for neck and back pain. Ex. 3 at 40. Her neck and back were doing well, but following a flu vaccination on October 11th she developed severe right shoulder and upper chest wall pain. *Id.* The pain started "almost immediately after the injection," and she was now unable to move her right arm. *Id.* She had been using heat as recommended by the nurse at work, and it had helped somewhat. *Id.* She rated her pain four out of ten on average, and seven out of ten at worst. *Id.* Her right shoulder range of motion ("ROM") was "full and intact," with pain at end ranges. *Id.* at 41. Dr. Lerman assessed her with subacromial bursitis, stating that her symptoms were "likely due to a flu shot that was too proximal and into the bursa creating an inflammatory reaction." *Id.* He administered a steroid injection and prescribed topical pain patches. *Id.*

Petitioner attended five PT sessions to treat her right shoulder pain, as well as neck and back pain, between October 19, 2018, and January 11, 2019. Ex. 2 at 20, 199, 206, 211, 219. Her pain ranged from three to ten out of ten. *Id.*

Petitioner saw primary care physician Scott Culp, D.O., on February 1, 2019, for B12 injections. Ex. 1 at 46. She also complained that she had "problems with her shoulder ever since" her October vaccination. *Id.* She had tried oral steroids and felt better for awhile before the pain returned. *Id.* On examination, her shoulder exhibited decreased ROM and strength and pain with abduction and adduction. *Id.* at 47. She was assessed with RSD of the upper limb and right shoulder pain. *Id.*

2

Petitioner underwent a right shoulder MRI on February 14, 2019. Ex. 4 at 14. The following week (February 22, 2019), she saw orthopedist Timothy Amann, D.O., for right shoulder pain. He noted that she had diffuse moderate tenderness throughout the shoulder region, and that active ROM was "very painful." *Id.* Dr. Amann assessed her with CRPS of the right upper limb and referred her for pain management. *Id.*

On April 2, 2019, Petitioner saw orthopedist Russell Huffman, M.D., for right shoulder pain. Ex. 5 at 13. She reported that after her October vaccination, she had immediate and severe pain, which had worsened over time. *Id.* A cortisone injection and oral steroids each helped for about a week or less. *Id.* She had engaged in PT but her pain persisted. *Id.* On examination, she had positive impingement signs. *Id.* He found the MRI to be of poor quality and ordered a repeat MRI. *Id.*

Two weeks later (April 16, 2019), Petitioner underwent a second MRI of her right shoulder. Ex. 5 at 227-28. The MRI showed mild acromioclavicular osteoarthritis with laterally downsloping acromion and subacromial spur, resulting in narrowing of the coracoacromial arch, mild subacromial subdeltoid bursitis, and bursal sided supraspinatus fraying. *Id.*

Petitioner returned to Dr. Huffman the following week (April 23, 2019) to review the MRI. Ex. 5 at 19. He noted that the MRI showed tendinopathy in the intra-articular portion of the long head of the biceps brachii but no evidence of full thickness rotator cuff tearing, although there was evidence of tendinopathy. *Id.* Dr. Huffman administered a steroid injection and referred her for PT. *Id.*

Petitioner saw Dr. Lerman a few days later, on April 26, 2019, for pain in her neck, lower back, and right shoulder. Ex. 3 at 37. She reported that the steroid injection she received in late October 2018 had helped with pain significantly until December, but by the day after Christmas her pain was severe, and her family physician gave her oral steroids. *Id.* The steroid injection she had received a few days before this appointment "was not as effective as the first injection." *Id.* Her pain was six out of ten on average, and eight out of ten at worst. *Id.*

On May 7, 2019, Petitioner underwent a PT evaluation for her right shoulder as well as neck and lower back pain. Ex. 2 at 61. She related her shoulder pain to vaccination, explaining that she had difficulty with overhead motions and reaching motions, and was unable to sleep or lay on her right side. *Id.* Her pain at rest was six to seven out of ten, and with activity it had risen to nine or ten out of ten prior to her recent steroid injection. *Id.* The PT record lists the location of her pain as including her neck, shoulder, and back. *Id.* Her ROM was within functional limits, but painful. *Id.* at 63.

Petitioner attended PT regularly over the following year, attending over 70 sessions through May 8, 2020. Ex. 2. At several of these sessions, she complained of problems unrelated to her right shoulder, including chest soreness, neck problems, headache, hip flexor/psoas problems, lower back and sacral pain, facial pain, and leg and

3

knee pain. *Id.* at 19, 49, 68, 72, 90, 93, 190, 197, 200. The PT records list diagnoses relating to Petitioner's right shoulder as well as cervicalgia and low back pain. *Id.* Her pain ratings during this time ranged between five and ten out of ten, and the records state that her pain was in her neck, shoulder, and back. *Id.* at 22, 36, 40, 61, 90, 102, 125, 166, 180, 185.

Petitioner returned to Dr. Huffman on June 4, 2019. Ex. 3 at 126. Her biceps and shoulder pain had improved, but her pectoralis minor tightness had continued. *Id.* Dr. Huffman administered a steroid injection and recommended that Petitioner continue PT. *Id.*

Petitioner saw Dr. Lerman on June 28, 2019. Ex. 3 at 34. She reported that shortly after her last visit in April, the steroid injection she had received a few days earlier provided relief of her shoulder pain, particularly over the biceps tendon. *Id.* She now had a continuous dull, aching pain that was six out of ten on average and nine out of ten at worst. *Id.* On examination, her ROM was full but painful at end ranges. *Id.* at 35. Dr. Lerman recommended that she return for a trial of Myobloc injections and continue topical pain relief. *Id.*

Petitioner followed up with Dr. Huffman on July 30, 2019, at which time he recommended surgery. Ex. 5 at 31. Petitioner saw orthopedist Keli Donnelly, D.O., for a second opinion on August 2, 2019. Ex. 6 at 13. She reported constant moderate to severe pain that had a burning and throbbing quality. *Id.* Her pain was aggravated by lifting, movement, and pushing, and relieved by heat, ice, steroid, massage, medication, PT, and stretching. *Id.* The pain interfered with her sleep, resulting in her working reduced hours. *Id.* Dr. Donnelly recommended shockwave therapy. *Id.*

Petitioner returned to Dr. Lerman on August 23, 2019. Ex. 3 at 31. She rated her pain seven out of ten on average and nine out of ten at worst. *Id.* Dr. Lerman administered Myobloc injections. *Id.* at 32. Three days later (August 26, 2019), Petitioner called Dr. Lerman's office and stated that she now had limited ROM and increased pain. *Id.* at 78. Petitioner returned to Dr. Lerman's office on August 29, 2019, and was assessed with an adverse reaction to Myobloc. *Id.* at 29. Petitioner received trigger point injections. *Id.* at 30. The following week (September 6, 2019), Petitioner followed up with Dr. Lerman, reporting that the trigger point injections "took the edge off her pain and tightness," but that her pain was overall worse. *Id.*

Petitioner underwent shockwave therapy with Dr. Donnelly on September 13, 2019. Ex. 6 at 11-12. At her PT appointment that day, Petitioner reported that the shockwave therapy was "very painful." Ex. 2 at 179. A few days later (September 17, 2019), Petitioner told Dr. Donnelly that she experienced significant bruising and "piercing pain" in her shoulder the day after she received shockwave therapy, and she would not continue with that course of treatment. Ex. 6 at 9-10.

Petitioner followed up with Dr. Lerman on September 30, 2019. Ex. 3 at 22. Her lower back recently "went out," and was generally worse in fall and winter months. *Id.* Due to ongoing pain, she cancelled her shoulder surgery. *Id.* Petitioner now rated her pain eight out of ten on average and nine out of ten at worst. *Id.*

Petitioner saw Dr. Huffman the next day (October 1, 2019). Ex. 3 at 118). Dr. Huffman discussed possible surgery in May 2020, and asked her to return in March. *Id.* Petitioner saw Dr. Williams on October 10, 2019 for right shoulder pain. Ex. 7 at 14. She had noticed that her shoulder felt better in a warm pool. *Id.* Dr. Williams noted that he thought her diagnosis had an element of subacromial impingement, but thought that some of her symptoms may not respond to subacromial decompression. *Id.* He recommended that she continue treatment with Dr. Lerman. *Id.*

Petitioner followed up with Dr. Lerman on December 13, 2019. Ex. 3 at 18. She rated her pain six out of ten on average, and nine out of ten at worst. *Id.* Pain woke her from sleep, and she had pain when her arm was hanging at her side. *Id.* Petitioner's active shoulder ROM was full and pain-free, though she had tenderness over the biceps tendon. *Id.* Although she was seen for neck, lower back, and shoulder pain, her shoulder was her primary complaint. *Id.* at 18-20. Dr. Lerman administered steroid injections into Petitioner's right biceps sheath and right shoulder subacromial arch. *Id.* at 20.

At Petitioner's PT session four days later (December 17, 2019), she reported that the steroid injections had decreased her pain and she was "feeling good" now, with her primary complaint now being lumbosacral pain. Ex. 2 at 220. On January 7, 2020, she reported during a PT session that her "[right] shoulder pain hasn't been an issue recently following injection for pain management." *Id.* at 18. However, a week later (January 14, 2020), she rated her pain eight out of ten, reporting that she had done too much at her last PT session, and over the weekend had headaches, spasms under her right shoulder blade, and chest tightness. *Id.* at 22. The next month, her pain improved to five to six. *Id.* at 36, 40.

Petitioner returned to Dr. Williams on March 6, 2020. Ex. 7 at 12. The December steroid injections continued to provide pain relief, and she reported "100% normal function" and rated her pain zero out of ten. *Id.* Dr. Williams recommended conservative care. *Id.* at 13.

The following month, however, Petitioner's pain returned. Ex. 7 at 10. Petitioner saw Dr. Williams by telemedicine on April 16, 2020, reporting that her pain had recurred, and that she was "really having quite a bit of trouble with it." *Id.* She now had 20% of normal function on the right, compared to 100% on the left side. *Id.* Her right shoulder pain ranged from three to nine and kept her awake at night. *Id.*

Petitioner saw Dr. Huffman by telemedicine on April 28, 2020. Ex. 5 at 46-49. She was "not doing well despite extensive non-operative treatments," and he recommended surgery. *Id.* She saw Dr. Williams in the office a few days later (May 1, 2020). Ex. 7 at 8.

5

She now reported 50% of normal function on the right side, and rated her pain between five and nine. *Id.*

On May 13, 2020, Dr. Huffman performed right shoulder arthroscopic surgical debridement, biceps tenodesis, and decompression. Ex. 5 at 60-61. Petitioner was given pain medications, include narcotics, after surgery. *Id.* at 167-68.

Petitioner began post-operative PT on May 29, 2020. Ex. 2 at 73. Her pain was now ten out of ten both at rest and with activity. *Id.* Her right shoulder passive ROM was 47 degrees in flexion, 15 degrees in external rotation, and 40 degrees in internal rotation, all with pain. *Id.* She continued to report pain levels of ten out of ten for over a month after surgery. *Id.* at 76-106.

During post-operative appointments on July 14 and 28, 2020, Dr. Huffman expressed concern that Petitioner had developed post-surgical adhesive capsulitis. Ex. 5 at 204, 216. She rated her pain ten out of ten, and her motion was "extremely limited." *Id.* at 216. Her ROM was limited to 45 degrees in abduction, 20 degrees in external rotation, and 120 degrees in forward elevation. *Id.* at 204, 219. Dr. Huffman recommended a manipulation under anesthesia ("MUA"). *Id.* at 220. An MRI confirmed signs of adhesive capsulitis. Ex. 19 at 24.

Petitioner underwent a right shoulder MUA, with a glenohumeral steroid injection, on September 9, 2020. Ex. 18 at 20-21. The same day, Petitioner underwent a PT evaluation of her right shoulder. Ex. 14 at 21. Her ROM was significantly improved by surgery. *Id.* She was unable to use her right upper extremity and had no sensation, as expected due to a nerve block. *Id.* Petitioner continued PT over the next several months, reporting pain levels ranging between seven and ten out of ten. Ex. 20 at 234, 244, 253.

At a post-operative follow up on September 15, 2020, Petitioner told Dr. Huffman that she felt she had lost ROM "every day since surgery." Ex. 11 at 136. She had been in PT daily but was in extreme pain and could not do her usual daily activities. *Id.* Dr. Huffman increased her steroid dose and directed her to continue daily PT and home exercises. *Id.*

Two weeks later (September 29, 2020), Petitioner saw Dr. Huffman and reported improvements in her ROM, which Dr. Huffman now described as "quite good." Ex. 11 at 146. Her right shoulder ROM was 160 degrees in elevation, 70 degrees in abduction, and 45 degrees in external rotation. *Id.* He advised her to continue PT. *Id.* At an orthopedic follow up on November 17, 2020, Petitioner reported that her shoulder continued to do well, but she was having a lot of neck and back pain from a car accident. *Id.* at 155.

Petitioner saw neurologist Enrique Lopez, M.D. on December 3, 2020 complaining of numbness and pain in her legs and right hand following a car accident, which had occurred in October (a month after her second shoulder surgery). Ex. 12 at 13. Dr. Lopez assessed her with cervicalgia, brachial plexus disorders, CRPS of the left upper limb, and

lumbar radiculopathy. *Id.* at 14. He noted "it is clear that she injured the brachial plexus on the right upper extremity as a consequence of [the car accident]." *Id.*

At an orthopedic follow up on January 5, 2021, Petitioner's shoulder was "doing great" other than her experiencing a lack of strength and a mass and swelling in the axilla of the right shoulder. Ex. 11 at 162. She was having a lot of neck and back pain, however. *Id.* An ultrasound of the axilla two weeks later showed "[p]ostsurgical changes of the right axillary soft tissues without suspicious mass, collection, or adenopathy." Ex. 19 at 19. At a PT session that day, her pain was seven out of ten at rest and ten out of ten with activity. Ex. 90 at 253.

On March 9, 2021, Petitioner followed up with Dr. Huffman. Ex. 11 at 168. She was having less shoulder pain, but felt weaker because she was unable to do her shoulder PT due to neck and back pain. *Id.* at 169. On examination, her right shoulder ROM was 175 in forward elevation, 90 degrees in abduction, and 50 degrees in external rotation, which Dr. Huffman characterized as "excellent." *Id.* at 169-70. She had a "myriad of other complaints," some of which were due to her car accident. *Id.* at 170. Dr. Huffman concluded that her shoulder was "doing well and will continue to improve." *Id.*

### B. Testimonial Statements

Petitioner submitted two declarations on her own behalf. Exs. 8, 17. She states that she received the vaccine at work, and that by the time she returned to her desk she was "experiencing severe pain" in her right arm. Ex. 17 at ¶ 2. She called the nurse, who offered her an ice pack. *Id.*

Sean Baird, Petitioner's husband, submitted a statement in support of the claim (although because it is unsworn and unsigned it is entitled to somewhat less weight). Ex. 21. Mr. Baird states that his wife "knew immediately something was horribly wrong the moment the needle went in." *Id.* at 1. The pain was "so intense she couldn't even drive for several hours." *Id.* He did not think that Petitioner had a full night of sleep again until after her surgery. *Id.* Her injury affected her social life, what she could wear, household tasks, and their level of intimacy. *Id.*

Mr. Baird adds that the only thing in their life worse than Petitioner's vaccination is the car accident they were in a month after her second shoulder surgery. Ex. 21 at 1. He states, "[w]e have lost years of productive living over this injury." *Id.* He asserts that Petitioner lost her job due to this injury and has suffered "devastating psychological effects." *Id.*

## II.   The Parties' Arguments

Petitioner seeks a pain and suffering award of $210,000.00, citing decisions in *Schoonover* and *Meirndorf*, both of which involved awards of $200,000.00. Petitioner's

Brief in Support of Damages, filed July 15, 2024, at *6-7 (ECF No. 44) ("Br.").[3] Petitioner asserts that she suffered a severe SIRVA that required extensive, aggressive treatment over a period of two years and five months. *Id.* at *7. She underwent two surgical procedures, five steroid injections, shockwave therapy, oral pain management including narcotics, and over 160 PT sessions. *Id.* At times, her pain was ten out of ten. *Id.*

Petitioner observes that compared to *Meirndorf*, she attended twice as much PT, underwent more diagnostic testing, and received more steroid injections. Br. at *7. Like the *Schoonover* petitioner, her mental health was affected and narcotic analgesics were required due to symptom severity. *Id.* And Petitioner underwent more diagnostic testing and remained symptomatic for longer. *Id.* Petitioner asserts that these differences merit a higher award than *Meirndorf* and *Schoonover*.

Respondent acknowledges that Petitioner suffered a severe injury and should receive an award consistent with previous severe cases, although he does not propose an actual amount. Respondent's Response, filed Sept. 16, 2024, at *16-22 (ECF No. 47) ("Resp."). Respondent notes that petitioners who underwent surgery or have "special extenuating circumstances" have received awards in excess of $95,000.00, and cites ten such decisions establishing an awards range of $95,000.00 to $205,000.00. *Id.* at *19-20. Three of the cases Respondent cites involved petitioners who underwent *two* surgical procedures, and the awards in those cases ranged from $185,000.00 to $205,000.00. *Id.*

Respondent agrees that Petitioner reported pain promptly after vaccination, and treated for two years and five months. Resp. at *20. Her treatment course included multiple prescription medications, four steroid injections, trigger point injections, 170 PT sessions, three MRIs, one arthroscopic surgery, and one MUA. *Id.*

However, Respondent asserts that "petitioner cannot reasonably attribute all of her claimed pain and suffering to her SIRVA, given her pre-vaccination history of CRPS and chronic pain." Resp. at *20. And while treating for her SIRVA, she regularly reported pain in her neck and back, which "contributed to her overall pain and suffering." *Id.*

Respondent argues that Petitioner's experience is factually distinguishable from *Schoonover* and *Meirndorf* in important ways – particularly in that Petitioner did not undergo two arthroscopic surgeries, while both of those petitioners did. Resp. at *21-22. In contrast, Ms. Baird underwent one arthroscopic surgery and one MUA – a significantly less invasive procedure. *Id.* at *22. And the *Meirndorf* petitioner treated for over three years, and her injury was described in the decision as "far more severe than usual." *Id.* (citing *Meirndorf*, 2022 WL 1055475, at *3).

---

[3] *Schoonover v. Sec'y of Health & Human Servs.*, No. 16-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020), and *Meirndorf v. Sec'y of Health & Human Servs.*, No.19-1876V, 2022 WL 1055475 (Fed. Cl. Spec. Mstr. March 7, 2022).

8

Petitioner replies that her SIRVA was "nothing short of severe, and required extensive, aggressive treatment." Petitioner's Reply, filed Sept. 18, 2024, at *2 (ECF No. 48) ("Reply"). Petitioner asserts that the Vaccine Program "has not necessarily maintained that the type of surgery has a great differentiating ability when it comes to damages." *Id.* Petitioner asserts that the petitioner in *Elmakky*,[4] who underwent two arthroscopic surgeries and one MUA, received the same award as the *Lawson*[5] petitioner, who underwent three arthroscopic surgeries. *Id.* at *3. Petitioner discerns from this that a "less invasive" surgery does not significantly weigh against a higher recovery. *Id.*

Petitioner takes issue with the cases Respondent cites, noting that one did not involve surgery, three involved significant treatment delays, and one involved multiple gaps in treatment, signaling a milder injury. Reply at *3. By contrast, Ms. Baird sought treatment *one day* after vaccination, and continued treating consistently without gaps. *Id.* at *4. The remaining cases Respondent cites involve awards of $185,000.00 to $205,000.00. *Id.*

### III.     Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[6]

---

[4] *Elmakky v. Sec'y of Health & Human Servs.*, No.17-2032V, 2021 WL 6285616 (Fed. Cl. Spec. Mstr. Dec. 3, 2021).

[5] *Lawson v. Sec'y of Health & Human Servs.*, No. 18-882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021).

[6] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

**IV. Appropriate Compensation for Pain and Suffering**

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

The parties agree that Petitioner suffered a severe SIRVA that continued for nearly two and a half years. Br. at *7; Resp. at *16. She underwent arthroscopic surgery, an MUA, five cortisone injections, over 160 PT sessions, three MRIs, Myobloc injections, trigger point injections, shockwave therapy, and multiple prescription medications, including narcotics. She reported her injury just one day after vaccination, and consistently reported high pain levels, at times ten out of ten. She had adverse effects following Myobloc injections and shockwave therapy.

At the same time, Petitioner had a pre-vaccination history of CRPS, and her PT records list diagnoses of neck and back pain in addition to shoulder pain. She frequently complained of neck and back pain, as well as other concerns, during PT sessions, suggesting that her PT was not *solely* to treat her shoulder injury. Indeed, she was in PT for neck and back pain *before* vaccination. While her PT records document high pain levels, they also state that her pain was not only in her shoulder, but also in her neck and back. Moreover, her car accident a month after her MUA likely contributed somewhat to her pain. Petitioner's requested award does not appear to take any of these factors into consideration.

I have noted that although MUA requires anesthesia (and thus is suggestive of great pain), it is less invasive than arthroscopic or open surgery, and may warrant a lower award. *Angerosa v. Sec'y of Health & Human Servs.*, No. 22-1022V, 2025 WL 2304436, at *4 (Fed. Cl. Spec. Mstr. July 7, 2025); *Amor v. Sec'y of Health & Human Servs.*, No. 20-0978V, 2024 WL 1071877, at *11 (Fed. Cl. Spec. Mstr. Feb. 8, 2024). The fact that the *Lawson* and *Elmakky* petitioners received the same pain and suffering award despite differences in their surgical procedures does not mean that there is no difference between those procedures; rather, other factors formed the basis of the identical awards.

This case is somewhat unique, given both the severity of Petitioner's condition and the complicating factors (her pre-existing CRPS, neck and back pain, and the 2020 car accident). Nevertheless, *Meirndorf* has many similarities. In this case and *Meirndorf,* the petitioners sought care promptly, suffered severe injuries, and underwent two surgical procedures, cortisone injections, and PT. While Ms. Baird attended more PT and received more cortisone injections, the *Meirndorf* petitioner's injury persisted for longer, and that petitioner underwent two arthroscopic surgeries. And throughout treatment, Petitioner reported pain in her neck and back in addition to her shoulder, and treated these and other conditions – suggesting that *not all* of her pain and treatment can be attributed to her SIRVA.

10

Accordingly, I find that an award of **$175,000.00** for pain and suffering is appropriate.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $175,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[7] Additionally, I find that Petitioner is entitled to **$5,763.56 in out of pocket expenses.**[8]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $180,763.56, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[9]

**IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[7] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[8] The parties agree on this amount. Br. at *8; Resp. at 2 n. 1.

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.